IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 04-20-06-PA |
| | ) | |
| Plaintiff, | ) | **OPINION** |
| | ) | |
| v. | ) | |
| | ) | |
| DWAYNE EDWARD STRAUB, | ) | |
| | ) | |
| Defendant. | ) | |

**PANNER, Judge.**

The Ninth Circuit remanded this matter to me "with
instructions to conduct an evidentiary hearing on whether [Mike]
Bauman[n] should have been given use immunity and then to take
any other appropriate steps."[1]  <u>United States v. Straub</u>, No. 06-
30135, 2007 WL 731348 (March 12, 2007).

The Circuit's remand order outlines a two prong showing a
defendant must make "to compel the government to grant immunity
to his witness."  The defendant must "show that: (1) the
testimony was relevant; and (2) the government distorted the
judicial fact-finding process by denying immunity."  The remand
order also identifies several areas where further development of
the record might aid in evaluating the appeal.

---

[1]  The remand order from the Circuit spells his name "Bauman"
but the parties spell it "Baumann."

1 - OPINION

**A.   Benefits Given to Other Witnesses**

The parties have filed "Amended Joint Stipulated Facts" reciting the benefits extended to certain witnesses who testified for the government.

**B.   Substance of Baumann's Testimony**

The proffer by defense counsel at trial was that during "the winter of 2003," Baumann encountered David Adams in a bar.  Adams seemed glum and sullen.  When Baumann asked what was the matter, Adams said, "I just shot a guy."  Robert Garrett was shot on February 8, 2003.

**C.   Reasons Baumann Asserted Fifth Amendment**

During the colloquy at trial, the government and defense counsel briefly outlined the scope of Baumann's proposed testimony and likely cross-examination.  Trial Tr. 842-45.  I then stated:

> Based on Mr. Haub's statement about what he intends to cross-examine about, it's clear that [Baumann] could be subjected to all kinds of criminal proceedings including perjury if he doesn't testify accurately.
>
> So, I -- I'm -- I guess the ruling properly is that he can come and testify, but if he does and takes the Fifth Amendment, I will allow him to remain silent.  I don't think -- Mr. Halley hasn't asked me and I doubt that I would be justified in granting him any kind of immunity to testify.

Trial Tr. 846.

Defense counsel then requested that the court grant Baumann immunity.  I declined to do so, based on the offer of proof that had been made.

2 - OPINION

THE COURT:    Under certain circumstances I could
grant immunity, but I don't think that I should
based on what you've said in your offer of proof.
I don't -- I don't think that's appropriate.  So
that's my ruling.  It's on the record.  You can
decide whether you're going to call him or not.

                    * * * *

MR. HALLEY:    I don't intend to call the witness
who is going to take the Fifth Amendment on the
stand in front of the jury, Your Honor.  And I
don't mean to waive my claim to present his
evidence, but I do think it would be prejudicial
to put on a witness and take the Fifth.

THE COURT:    I understand.  Your record is made to
the extent that you have made an offer of proof.

Trial Tr. 846-47.

Defendant Straub was convicted.  He appealed.  The Ninth

Circuit then entered a limited remand.

On April 24, 2007, I conducted an evidentiary hearing.

During part of that hearing, the courtroom was cleared of

everyone except Mr. Baumann and his attorney, Michael Greenlick.

During the *in camera* proceeding, Greenlick explained further why

he had advised his client to assert his Fifth Amendment privilege

against compulsory self-incrimination if called to testify as a

witness at Defendant Straub's trial in April 2005.  A transcript

of that proceeding will be filed under seal.  The record now also

includes the proffer originally made at trial by former defense

counsel, along with notes by trial counsel and his investigator

regarding their interview with Baumann.  Exhibits 2, 3 and 4 to

Defendant's Brief Regarding Witness Immunity.[2]

---

[2] Exhibit 4 is dated nine months after the interview.  It may
be a transcription of contemporaneous notes, though the record is
not clear on that point.

At the evidentiary hearing, the Assistant United States Attorney ("AUSA") represented that "Baumann was not in any way a target of the criminal prosecution, and . . . was nowhere on the radar screen . . . . We had no interest in Baumann as a criminal defendant, and we had no evidence that Baumann was involved in this conspiracy at all.  None whatsoever."  However, the AUSA then asserted that "Baumann was found with this defendant in West Linn committing a criminal offense . . . . And Baumann was in fact a member of the White Neck Crew and he was a gang member, a friend of the defendant."  April 24, 2007 Tr. at 15-16.

The Fifth Amendment privilege against compulsory self-incrimination "not only extends to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant" providing "the witness has reasonable cause to apprehend danger from a direct answer." United States v. Hoffman, 341 U.S. 479, 486 (1951). See also Kastigar v. United States, 406 U.S. 441, 445 (1972) (privilege "protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution *or could lead to other evidence that might be so used*") (emphasis added).

In some circumstances, the privilege may apply even though the witness is innocent of any crime, or intends to assert innocence if he testifies.  "[T]ruthful responses of an innocent witness, as well as those of a wrongdoer, may provide the government with incriminating evidence from the speaker's own mouth." Ohio v. Reiner, 532 U.S. 17, 21 (2001) (per curiam).

4 - OPINION

That the witness subjectively apprehends such danger "does not of itself establish the hazard of incrimination." <u>Hoffman</u>, 341 U.S. at 486.  "A danger of 'imaginary and unsubstantial character' will not suffice." <u>Reiner</u>, 532 U.S. at 21 (quoting <u>Mason v. United States</u>, 244 U.S. 362, 366 (1917)).  "It is for the court to say whether his silence is justified," and also "to require him to answer if 'it clearly appears to the court that he is mistaken.'" <u>Hoffman</u>, 341 U.S. at 486 (citations omitted).

"However, if the witness . . . were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee." <u>Id.</u> "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure might result." <u>Id.</u> at 486-87.

It is unlikely that Baumann's testimony would directly have implicated him in a crime.  Nevertheless, the government had cast a very wide net, alleging a far-ranging conspiracy involving a myriad of persons and acts over an extended period of time. Nearly a dozen individuals associated with Defendant Straub had already been indicted.  Others had agreed to testify for the government in exchange for not being prosecuted, or were under investigation.  The prosecutor repeatedly accused Straub of running a "gang"[3] and he declared that Baumann was a member of

_____

[3] Whether such an entity actually existed is beyond the scope of this opinion.

that organization.  Many friends and associates of Straub
testified they had at least some knowledge of Straub's
involvement in one or more activities alleged in the indictment.
The prosecutor denied that Baumann was then the target of any
investigation, but it was difficult to ascertain in advance
precisely what path the cross-examination might have taken.
Where the questioning would commence was clear.  The prosecutor
candidly explained that his examination would seek to portray
Baumann as a close associate of Straub who would do anything for
Straub, even lie under oath.[4]  Trial Tr. 845.

Given the circumstances, Baumann's experienced counsel
recommended that his client assert his Fifth Amendment privilege.
I stated at the time that there appeared to be sufficient grounds
for asserting that privilege.  Put another way, the assertion of
privilege was not "clearly . . . mistaken."  Hoffman, 341 U.S. at
486.  The in camera testimony during the recent evidentiary
hearing did not alter that conclusion.

D.    Distortion of the Fact-Finding Process

When a defendant alleges that immunity was wrongly withheld
from a prospective defense witness, the Ninth Circuit usually
requires the defendant to prove that the government deliberately
distorted the fact-finding process by denying immunity.  See
Williams v. Woodford, 384 F.3d 567, 600 (9th Cir. 2004)
(defendant must prove "the prosecution refused to grant the
witness use immunity with the deliberate intention of distorting

_____

[4] The mere possibility that a witness will lie under oath,
thereby exposing himself to a subsequent perjury charge,
generally is not a sufficient independent basis for asserting the
Fifth Amendment privilege.

6 - OPINION

the fact-finding process"); <u>United States v. Young</u>, 86 F.3d 944, 949 (9th Cir. 1996) (inquiry is "whether the government intentionally distorted the fact-finding process"); <u>United States v. Baker</u>, 10 F.3d 1374, 1415 (9th Cir. 1993) (same).[5]

In <u>United States v. Westerdahl</u>, 945 F.2d 1083 (9th Cir. 1991), the panel opinion was internally inconsistent. Sometimes the test was described as "whether the government intentionally distorted the fact-finding process," but at other times the opinion seemed to focus on the practical effect of denying immunity rather than upon the government's subjective intent. <u>Id.</u> at 1087.

---

[5] The "intentionally distorted" standard also has been followed in several memorandum dispositions. <u>See United States v. Price</u>, 84 Fed. Appx. 917, 920 (9th Cir. 2003) (unpublished); <u>United States v. Bailey</u>, 83 F3d. Appx. 869, 872 (9th Cir. 2003) (unpublished). The Third Circuit has used that standard, but also utilizes an alternative standard focused on the importance of the evidence rather than the government's subjective intent. <u>Government of the Virgin Islands v. Smith</u>, 615 F.2d 964 (3d Cir. 1980) (immunity must be properly sought in the district court; the defense witness must be available to testify; the proffered testimony must be clearly exculpatory; the testimony must be essential; and there must be no strong governmental interests which countervail against a grant of immunity). <u>See also United States v. Herman</u>, 589 F.2d 1191 (3d Cir. 1978). <u>Cf. Autry v. Estelle</u>, 706 F.2d 1394, 1401-02 (5th Cir. 1983) (rejecting Third Circuit view); <u>United States v. Serrano</u>, 406 F.3d 1208, 1218 (10th Cir. 2005) (power to grant immunity rests solely with prosecution, though not entirely precluding possibility that deliberate abuse of this power might give rise to remedy); <u>People v. Schmidt</u>, 455 N.W.2d 430 (Mich. App. 1990) (prosecutorial misconduct required before defendant may be entitled to remedy).

This topic also has attracted the attention of commentators. <u>See</u>, <u>e.g.</u>, 5 LaFave, Israel, and King, CRIMINAL PROCEDURE § 24.3(i) (2d ed. 2007); Uviller, *No Sauce for the Gander: Valuable Consideration for Helpful Testimony from Tainted Witnesses in Criminal Cases*, 23 CARDOZO L. REV. 771 (2002); R. Gordon, *Right to Immunity for Defense Witnesses*, 20 CONNECTICUT L. REV. 153 (1987).

The remand order in the present matter states:

> Appellant does not allege prosecutorial misconduct, but he does maintain that immunity was warranted because the government gave immunity or special considerations to many of its witnesses, while refusing immunity for Bauman.

Remand Order at 3.

If prosecutorial misconduct is a required element--as Ninth Circuit precedent appears to hold--then the preceding statement should end the inquiry. Nevertheless, the panel in this appeal appears to be focusing entirely upon the _effect_ of the government conduct--whether it "distorted the fact-finding process"--and not upon the government's subjective intentions and motives.

To facilitate matters on appeal, I divide the inquiry into two parts: first, whether denial of immunity had the effect of distorting the fact-finding process (regardless of any subjective intent to accomplish that end) and, second, whether the government deliberately distorted the fact-finding process.

### 1.   Effect Upon the Fact-Finding Process

#### a.   Importance of Testimony by David Adams

The testimony of David Adams was important on counts three and four of the indictment. Adams was the only witness who testified Straub was armed that evening. Adams said he did not actually see Straub shoot Garrett, but only heard the gunshot. Trial Tr. 821. _But cf._ Trial Tr. 1035 (closing argument) ("And we know that the defendant's the one who shot that gun because Mr. Adams told you so.") Adams also testified he saw Straub fire other shots that night, and during another robbery several months earlier. Trial Tr. 838-39, 864-65.

In theory, the jury could have convicted Straub on a Pinkerton conspiracy theory even if the jurors believed Adams was the shooter. The jury was instructed it could convict Straub if it determined that Straub was part of the conspiracy and, further, that the shooting of Garrett was reasonably foreseeable.

Nevertheless, the testimony of Adams was important to the prosecution's case. If a jury believed that Adams lied about this, and was shifting the blame to Straub for his own actions, it would seriously weaken the government's case on counts three and four. Adams admitted he personally participated in other home-invasion robberies. The defense could have argued that Adams, not Straub, orchestrated the Garrett robbery and shooting, without Straub's involvement or knowledge.

Witness Misty May testified that--approximately ten days before the shooting--she overhead Garrett's former girlfriend, Sherri Wilson, telling Straub and Adams about Garrett's marijuana grow operation and suggesting how someone could break in.

May's testimony, though damaging to the defense, does not exclude scenarios in which Straub played no role. For instance, Adams might have acted upon this information himself, without Straub's involvement. Or Wilson, who allegedly wanted revenge on Garrett, Trial Tr. 573, may have told the same story to other persons. May's testimony, by itself, would not be enough to sustain a conviction on counts three and four. The testimony of Adams therefore was crucial.

### b. Importance of Testimony by Mike Baumann

The Circuit's remand order states "that Bauman[n]'s testimony is relevant because it raises credibility questions

about a key prosecution witness." Baumann would have testified that, on an unspecified date during the winter of 2003, Adams stated, "I just shot a guy." At trial, Adams denied making the statement. To that extent, Baumann's proffer tended to contradict the testimony of Adams.

However, even if Adams made the disputed statement, it does not prove he actually shot someone. Adams might have been joking, or trying to appear tough. He might also have meant that he was present when Garrett was shot, which he readily conceded at trial.

Furthermore, even accepting the Baumann proffer literally, it does not prove Adams was referring to Garrett. Adams admitted having "engaged in a series of intrusions into homes for purposes of getting methamphetamine and marijuana and money," Trial Tr. 840, including instances during which weapons were carried and even discharged by a participant in the robbery. Trial Tr. 862-65. Adams himself had once been accused of armed robbery. Trial Tr. 878. Whether Adams was referring to the Garrett shooting, assuming he made the disputed statement, is speculative.

Baumann's testimony would have given the defense some additional ammunition in attacking the credibility of Adams, but would not "directly contradict" the most important testimony by Adams, nor clearly exonerate Straub on these two counts.

### 2. Deliberate Intent to Distort Fact-Finding Process

The government did not deliberately distort the fact-finding process in an improper manner.[6] While the list of government

---

[6] The added "improper manner" language merely acknowledges that all efforts by parties during trial are aimed at shaping the

witnesses who received benefits is lengthy, the investigation uncovered substantial criminal activity. Considerable effort was necessary to bring the principals to justice. Extending favorable treatment to witnesses in return for testimony is a common practice in such situations. Though no defense witnesses received immunity or favorable treatment, Defendant never sought immunity for any prospective defense witness, with the possible exception of Baumann.

Nor did the government seek to persuade Baumann not to testify or to invoke his Fifth Amendment privileges. Cf. Smith v. Baldwin, 466 F.3d 805 (9th Cir. 2006) (prosecutor threatened to seek death penalty against witness if he testified, in accordance with affidavit, that man in prison for murder was not the killer), rehearing en banc granted, 2007 WL 1031654 (April 6, 2007); Serrano, 406 F.3d at 1216 ("neither the prosecutor nor the district judge discouraged the witnesses from testifying through threats of prosecution, intimidation, or coercive badgering").

The government did express an intent to cross-examine Baumann regarding gang membership, and whether Baumann was "lying for him as a gang member . . . ." Trial Tr. 845. Without more, this is not coercive conduct that gives rise to a due process violation. The government was entitled to cross-examine a key witness regarding his testimony and potential bias, and to elicit facts that may bear upon the credibility of the witness.

---

fact-finding process. Only improper efforts to distort the fact-finding process are condemned. Cf. United States v. Gobbi, 471 F.3d 302, 312 (1st Cir. 2006) ("By design, all evidence is meant to be prejudicial; it is only unfair prejudice which must be avoided") (emphasis in original).

Furthermore, the government did not refuse to grant Baumann immunity. It was never asked to grant Baumann immunity. Defense counsel reportedly learned of this witness during (or on the eve of) trial. An attorney was retained to represent the witness. The matter was brought to my attention during a brief recess in the trial. The threshold question was whether Baumann was entitled to invoke his Fifth Amendment privilege against compulsory self-incrimination. I determined that he was. Defense counsel then suggested the court grant Baumann immunity. I declined to do so.

The government did not make that decision. Moreover, given the restrictions established by Congress, the prosecutor had no authority to grant immunity on-the-spot, as defense counsel proposed. See 18 U.S.C. § 6003(b) (specifying which officials may authorize a request for immunity).

In any event, I do not find the fact-finding process was distorted considering all the evidence at trial.

DATED this 11th day of May, 2007.

Owen M. Panner
United States District Judge

12 - OPINION